GEORGE GRAY, Administrator of RICHARD THOMAS, deceased,

*vs.*

DANIEL CORBIT and WILLIAM C. SPRUANCE, Trustees, CHARLES E. A. MAILLEY, RICHARD L. MAILLEY, EUGENE C. MAILLEY, CATHARINE EUGENIA MAIL-LEY, SAMUEL C. THOMAS, CATHARINE F. THOMAS, LOUISA C. THOMAS, EDWARD H. THOMAS, HENRY BUZBY, AMANDA I. BUZBY, WILLIAM DUDLEY and RACHEL W. DUDLEY.

*New Castle, Feb. T. 1871.*

An interest in land or the profits of land to be transmissible to representatives, must be assignable, devisable, and subject to debts.

Where the trust was created by will for the maintenance and support of a feeble-minded son, a limitation over to the issue of such son, if any, would be altogether too slender a ground to support the construction that the testator, in providing for the contingency of issue, contemplated the probable improvement in mental capacity of his son, and therefore intended to create a transmissible interest or estate in the subject-matter of the trust.

The maxim "*expressio unius, exclusio alterius*" raises but a very inconclusive presumption of intent on the part of the testator, such as is always open to be explained by collateral facts, or to be rebutted by counter presumptions arising from the will.

Syllabus

A trust for the general benefit of a person *sui juris*, which not being restricted to maintenance only, may so be used as to confer substantial advantages of ownership, will vest a transmissible interest in the *cestui que trust*. Where, however the trust is restricted to the maintenance and support of an imbecile person, incapable of managing his affairs, it will not vest any transmissible interest in the *cestui que trust*.

The residuary clause directing the conversion into money of all the testator's " real and personal estate not hereinbefore devised or bequeathed," to be distributed among his children in certain shares, amounts to an express exclusion of the residuary devisees from the surplus of rents accruing from the devised real estate. All interests in land, which are not disposed of by will, result to the heir at law. Rents and profits of land accumulated during a period prior to the taking effect in possession of future limitations, pass to the heir at law by way of resulting trust.

The doctrine of testamentary gifts by implication without direct words is well established, and is a necessary concession to the conditions under which wills are generally made. But in such cases the evidence of the testator's intent must arise from the face of the will, the implication must be of a conclusive nature, and such a gift presupposes that the testator had the subject-matter of the gift before his mind and intended the disposal of it in question. It is not competent therefore for the courts to establish the gift by implication, upon a mere conjecture as to what the testator would have done had he anticipated the contingency which had afterwards arisen.

A resulting trust in lands, arising out of the payment of the purchase money,is a latent equity, which cannot prejudice a *bona fide* holder for value, and a party taking under partition in Chancery is such a purchaser for value of the allotment made to him.

Where trustees under a will held as trust property real estate, the rents and profits of which were limited to the maintenance and support of the *cestui que trust*, and a share of the residue limited to be used for the same purpose, if necessary, both the real and personal estate being afterwards limited over, and the trustees invested the surplus rents and profits in other real estate which was conveyed to them upon the same trusts as those limited in the will; *Held*, that after the death of the *cestui que trust*, the heirs at law of the testator, being entitled to the surplus rents and profits, were entitled, in equity, to have their fund reimbursed out of the residuary personal estate, for the amount invested in lands, upon the same trusts as those upon which the residuary estate was made.

BILL IN EQUITY.—The material facts of this case are as follows :—

Richard Thomas died Feb. 24, 1870 and letters of administration upon his estate were granted to George

Gray, Esq., the complainant. Samuel Thomas, the father of Richard, had died April 20, 1829 having made his will under date of April 5, 1829 by which, among other things, he devised to Daniel Corbit and James Booth in fee simple sundry parcels of real estate, in trust, to apply one half of the net rents and profits to the support of Mary Ann Thomas until she reached the age of twenty one years, then to her sole and separate use, and at her death subject to her will or appointment or in default, to her heirs in fee ;—further, to apply the other half of the said net rents to the support of Richard Thomas ''at such place and in such manner as they think proper,"—at his death to his children and issue, if no such issue, living at his decease, then, for the sole use of Mary Ann, if living, subject to same provisions as the first moiety, limited for her benefit, if she should not be living, or in the event of her dying after, then subject to her will or appointment and, in default of such appointment, to her heirs. It was also provided that the trustees might reimburse their expenses &c., that they should pass annual accounts of their trusteeship as to Richard's share, that they should be allowed compensation for their care and trouble, and that any vacancy in the trusteeship should be filled by appointment of the Chancellor with the assent of the remaining trustee.

The residue was directed to be converted into cash, and to be divided into eleven parts, two of which parts were given to each of the testator's children, Richard, Charles Edward and Mary Ann and one part each to the remaining children,—David, Samuel and William. Richard's portion of the residue was to be held by the said trustees, under the like trusts as before provided as to the real estate.*

---

* The full text of so much of the will as was recited in the bill was as follows :—

" *Fourth.* I give and devise unto Daniel Corbit, of Cantwell's Bridge, " aforesaid, and James Booth, of the town of New Castle, the following real " estate, to wit :—all that tract or plantation of land situated in Saint Georges

18—DEL. CH. IV.

After the death of Samuel Thomas his will was duly proved and letters testamentary were granted unto the said Daniel Corbit and James Booth.

The trustees Messrs. Corbit and Booth became seized of another tract of land, which is described in the bill, containing about twenty-two acres, purchased from Charles Tatman, June 13, 1831, and conveyed to them upon the same trusts as those contained in the will. The bill alleges that this land was purchased out of surplus rents and profits of the trust real estate, and this was also so stated in the answers of the trustees and that of the children of Samuel and Edward Thomas, Richard's brothers but in the answers of the children and grandchild of Mary Ann Mailley it was averred that this lot

" Hundred aforesaid, which I purchased of William Frazer, deceased, com-
" monly called and known by the name of White Hall, also all that tract of
" land thereto adjoining formerly of John Dickenson Esquire, deceased, the
" whole of said two tracts being now in the possession of Alexander McCaulley,
" together with all and singular the buildings, improvements and appurtenances
" to the said two tracts belonging, also all that my mansion House, situate in
" the village of Cantwell's Bridge aforesaid, and the lot of ground on which
" the same is erected, which was conveyed to me by my late father-in-law,
" David Wilson, deceased, together with all other the buildings, outhouses,
" improvements and appurtenances thereunto belonging ; also all that house
" and lot situate in said village, with all the buildings improvements and ap-
" purtenances thereunto belonging, the said lot being the same which was con-
" veyed to me by the deed of John Hirons and wife, and is now .devised as
" the same is bounded and described in said deed.   Also all that house and
" lot situate in  said village, at the angle formed by the  main street and the
" Middletown Road, with all the buildings, improvements and  appurtenances
" thereunto belonging, now occupied by  my said son Samuel Thomas, and
" containing about two and an  half acres more or less, also all that parcel of
" land adjoining said village which was lately conveyed to me by John Janvier
" and wife, of the town of New Castle by their deed bearing date on or about
" the nineteenth day of February last past, and also all that  parcel of marsh
" situate on Appoquinimink Creek in Vances' Neck in Saint Georges Hundred
" aforesaid, containing about thirty-five acres more  or less.   The said Daniel
" Corbit and James Booth to have and to hold  all and singular the said real
" estate mentioned in this fourth item of my will, together with all the heredi-
" taments and appurtenances thereunto belonging, unto them the  said Daniel

was not purchased with the surplus rents and profits but out of Richard's share of the residue.

Mary Ann Thomas married Augustine Mailley, and died December 18, 1845, leaving six children, Charles E. A., Samuel T., Augustine, Richard L., Eugene C., and Mary Constance, the latter of whom died December 26, 1848, intestate and without issue, leaving her five brothers as her heirs at law. The said Mary Ann Mailley having in her lifetime made no will or appointment, on February 3, 1846, the trustees conveyed to her children the moiety of the trust estate devised by her father's will for her benefit and also of the twenty-two acres purchased from Tatman. In 1853 partition was made of all the real estate into moieties, one of which was assigned to the five

" Corbit and James Booth, their heirs and assigns forever, as trustees, upon the " trust, and for the purposes hereinafter mentioned concerning the same, that is " to say : Upon this trust and confidence that the said trustees and the sur- " vivor of them and his assigns, shall and do after deducting taxes, repairs " and such reasonable expenses as may attend the execution of the trust here- " in contained, apply and dispose the one moiety of the clear rents, issues and " profits of the said real estate, as the same shall from time to time be received, " to the respectable maintenance and support of my daughter, Mary Ann " Thomas, until she shall attain the age of twenty-one-years, and after that " period pay the same during her natural life into her own proper hands, or to " such person or persons as she shall, from time to time appoint to receive the " same, by any writing or writings to be signed by her, or otherwise shall " permit and suffer her to receive the same. To the intent and such is my will " that the same shall be so applied, paid or received to and for her own sole " and separate use, benefit and disposal, and shall not be liable for the debts, " engagements, encumbrances, or control of any husband with whom she may " hereafter marry, and the receipts of my said daughter, whether covert or sole, ' or the receipts of such person or persons as may be appointed by her as afore- ' said to receive the same, shall be from time to time sufficient to discharge the " said trustees and every of them, of and from the said moiety of the said rents, " issues and profits, or so much thereof as shall thereby from time to time be " acknowledged to be received. And upon this further trust, that the said trus- " tees or the survivor or his assigns, shall and do, from and after the decease " of my said daughter Mary Ann, convey and assure the one moiety of the said " real estate, unto such person or persons, in such share or shares, and for such " estate or estates, as my said daughter whether covert or sole, by her last will

then surviving children and the other to the trustees, the latter taking the Tatman farm as a portion of their moicty. Sam'l Thomas died in 1861, without issue and Augustine died in 1865, leaving one child, Catharine Eugenia Mailley.

In 1855 James Booth died and in September, 1869, William C. Spruance was duly appointed co-trustee in his stead, and conveyances were made to vest the title, and Messrs. Corbit and Spruance went into and remained in possession of the real estate. They were also in possession of a fund of about twenty thousand dollars, partly from a legacy of David Wilson to Richard Thomas, and partly from his share of the residue, but chiefly from the excess of rents and profits of the trust real estate above expenses and his maintenance.

---

" and testament in writing, or any writing in the nature of, or purporting to be
" her last will and testament, to be by her published, signed and sealed in the
" presence of two or more witnesses, shall direct, limit or appoint, and in de-
" fault thereof, then in fee simple to the lawful heirs of my said daughter
" Mary Ann ; and upon this further trust, that the said trustees and the survivor
" and his assigns (the deductions aforesaid being first made), shall and do pay,
" apply and dispose the other moiety of the said clear rents, issues and profits,
" as the same shall from time to time be received to the comfortable and respect-
" able maintenance and support of my son Richard Thomas, during his nat-
" ural life, at such place and in such manner as my said trustees, or the survivor
" or his assigns in their or his discretion may think proper, and shall from and
" after my said son Richard's decease, convey and assure in fee simple the re-
" maining moiety of the said real estate, unto all and every lawful children of
" my said son Richard (in case he marries and has children) as shall be living
" at the time of his death, to be equally divided among them, if more than
" one, share and share alike, and the issue of any child or children as shall be
" then dead, in the manner aforesaid, such issue to have his, her or their par-
" ent's share only. But in case my said son Richard shall have no such
" children or grandchildren living at the time of his decease, then the last said
" moiety of the said clear rents issues and profits, as the same shall from time
" to time be received, shall be for the sole and separate use, benefit and dis-
" posal of my said daughter Mary Ann, if she be then living, for and during
" her natural life, to the same intent and purpose, and in the same manner and
" form, and under the same directions in all respects as is before mentioned con-
" cerning the moiety of the said clear rents issues and profits already directed to

Richard Thomas died without issue. . His heirs were (1,) the then surviving children and grandchildren of his sister Mary Ann, (2,) the two children of his deceased brother Samuel, Amanda T., wife of Henry Buzby and Rachel W., wife of William D. Dudley, and (3,) the three children of his brother Edward Thomas, Caroline F., Louisa C., and Edward H.

Mr. Corbit, the acting trustee, had regularly passed the accounts of the trust estate, of which there were two sets, the joint account and that of Richard Thomas' share, separately. By the first account of July 13, 1831 there appeared a balance overpaid by the trustees of $628.07$\frac{1}{2}$, which in May 13, 1833 had been overpaid out of rents and other funds, and, from that time, the receipts by the trustees were in excess of the expenditures.

---

" be applied or received to the sole and separate use of my said daughter, and " if my said daughter shall not be living at the time of my son Richard's de- " cease, or in case of her death at any time after his decease, then in either " such case, the said remaining moiety of the said real estate, shall be conveyed " by the said trustees, or the survivor, or his assigns unto such person or persons " in such share or shares, and for such estate or estates, as my said daughter " whether sole or covert by her last will and testament in writing, or any " writing in the nature of, or purporting to be, her last will and testament, to " be by her published, signed and sealed in the presence of two or more wit- " nesses, shall direct, limit or appoint, and in default thereof, then in fee simple " to the lawful heirs of my said daughter Mary Ann.

" And I do hereby expressly declare, and it is my will that it shall and may " be lawful for the said trustees and the survivor and his assigns in the first place " out of the said trust estates to deduct and reimburse him and themselves re- " spectively all such losses, costs, charges and expenses as they or any of them " respectively shall sustain, expend or be put unto for or by reason of the trusts " hereby in them respectively reposed, or the management or execution thereof, " or any other thing in any wise relating thereto, and I hereby direct the said " trustees or the survivor or his assigns in each and every year before the Chan- " cellor of the State of Delaware for the time being to pass a regular account of their " transactions respectively in relation to my said son Richard, in which account all " reasonable allowances and compensations shall be made to the said trustees " respectively, for their or his care, trouble and services, and such or similar " reasonable allowances and compensations shall be made by my said daughter

The funds received by them were from a small legacy to Richard Thomas from his grandfather David Wilson, his share of the residue of the estate of his father Samuel Thomas, and the rents and profits of the real estate devised by his father for his "maintenance and support." The Tatman lot had been paid for by the trustees out of the joint trust estate before the division of the balance of the joint account between the funds for the benefit of Richard and Mary Ann respectively. There had been a gradual accumulation of surplus rents and profits so that the estate in the hands of the trustees, at the time the suit was commenced, comprised in addition to the real estate, some $20,000 in money and securities.

The details of the accounts so far as they had any

" Mary Ann for care trouble and services in their or his transactions in rela-
" tion to her. And I also direct that when and so soon as either of the said
" trustees shall happen to remove from this State, die, or otherwise become
" incapable of acting, that then the remaining trustee, shall forthwith assign the
" said trust estates to a new trustee to be appointed by the Chancellor of the
" State of Delaware for the time being (with the assent of the remaining trus-
" tee) in such manner as that the legal interest thereof may be vested in such
" remaining trustee, and such other new trustee, appointed in manner aforesaid,
" upon the trusts aforesaid, and so from time to time, and as often as the pre-
" sent or any succeeding trustee shall be reduced to one, to the end that the
" said trusts may not descend to any heir, executor or administrator."

\*        \*        \*        \*        \*        \*        \*        \*

" *Seventh.* All the rest and residue of my real and personal estate whatso-
" ever not hereinbefore devised or bequeathed and also all my said Plate in
" case my said daughter Mary Ann shall not accept the same shall be sold and
" disposed of by my executors as soon as conveniently may be, either at public
" or private sale for cash or upon such credit or terms as my executors in their
" discretion shall see proper ; and they or the survivor shall be at liberty to sell
" my real estate either together or in parcels, to the best purchaser or purchasers
" and for the best price or prices, which can reasonably be obtained for the
" same, and secure the payment of the purchase money in such manner and
" form as they or the survivor may think proper and execute all such deeds of
" conveyance as may be needful and necessary for conveying such real estate,
" and every part and parcel thereof to the purchaser or purchasers."

" *Eighth.* After payment of my funeral expenses and all debts which I

material bearing upon the case are given in the opinion so fully as to render unnecessary any further statement of them here.

Richard Thomas was weak-minded, before his father's death, and so continued until his own death.

The bill claimed that the complainant, as administrator of Richard Thomas, was entitled to the money arising from the Wilson legacy, the unexpended interest on Richard's share of the residue of his father's estate and the unexpended rents of the real estate, and also to one moiety of the Tatman land or of the proceeds of it when sold under the decree of this Court. The refusal of the trustees to pay over these sums was charged and a decree asked against them. The answer of the children and

"shall justly owe at the time of my decease, and after deducting all costs, "charges, and expenses attending said sales, and the said deeds of conveyance " and every matter relating thereto, and also after deducting the legacies which "belong to my said sons Richard, Charles, Edward, and my daughter Mary " Ann, under the will of David Wilson deceased, which legacies were received " by me from John Janvier of New Castle, and which I now direct my execu- " tors to discharge and satisfy, then and in such case after the said deductions "shall be so made, I order and direct the residue of the monies, arising from such " sale, as aforesaid and all monies arising from the collection of debts or other- " wise to be divided into eleven equal parts. And I do give to my sons afore- " said, David Wilson Thomas, Samuel Thomas and my son William Corbit " Thomas, each, one of the said parts.

" And to my said son Richard Thomas, Charles Thomas, Edward Thomas, " and my daughter Mary Ann Thomas, each a double share, that is to say; to each " of them two of the said parts ; the share of my said son Richard to be applied " by the said     *   *   *   *   *     in their capacity of trustees for his use and "benefit and if not expended or disposed of in his lifetime, then upon his " decease, in case he shall leave no lawful issue living at the time of his death, "it shall go absolutely to my said daughter Mary Ann, for her sole and separate " use, but in case she be not then living, then it shall go to such person or per- " sons, and in such parts or shares as she shall order and direct by her last will " and testament in writing or by any writing in the nature of, or purporting " to be her last will and testament, to be published signed and sealed by her in " presence of two or more witnesses. And in default thereof then to the law- " ful heirs of my said daughter Mary Ann Thomas."

grandchildren of Mary Ann Mailley claimed the income of the residue, it not having been needed for Richard's support and, therefore, having remained intact and also the invested surplus of rents. As a part of the residue of Samuel Thomas' estate they also claimed the Tatman lot which, as already stated, they alleged had been purchased out of it.

The answer of the Thomas family, claiming that they were among the heirs of Richard, admits that his administrator was entitled to the personal estate left, but claimed to be entitled, with the Mailley children, as heirs at law, to the moiety of the Tatman land. They admitted the propriety of the conversion of the excess into land but not subject to the trusts and claimed that it should be held for Richard's heirs to whom the excess belonged.

*Higgins*, for the complainant.

The fund held by the trustees was derived from three sources. 1. The Wilson legacy. 2. The rents of the real estate, or its surplus. 3. The share of Richard Thomas in the residue, if any remain. We admit that the Wilson legacy, although not part of the trust, was expended early in the administration of the trust. With respect to the rents and profits, we claim that Richard's administrator is entitled to the surplus of these over and above the amount expended for his maintenance. This depends upon the construction of the will; it is a question of intent, to be gathered from its language. There are no words disposing of accumulations, as such. The will purports to give Richard the whole moiety, subject to the limitation over. There is an absolute gift of all the rents and profits to Richard, subject, only, to a restriction as to the mode of its application. This arises,—

1. From the language of the provision itself. The testator evidently contemplated that Richard's mainte-

nance would exhaust the whole, and the result for some years warranted such expectation. He therefore made it as a complete disposal, and made no disposition of any surplus. Had he contemplated a surplus he certainly would have provided for it. The direction to apply is peremptory, "shall and do." The direction as to place and manner implies no restriction, but the contrary. It implies that whatever was comfortable and respectable was to be provided for, without limitation as to amount. The disposition to Richard is in same terms as of that with respect to the moiety given to Mary Ann, except as to the mode of applying the income. Yet it will not be denied that it was complete as to her. There is a like provision for maintenance of Mary Ann, during her minority, in almost the same language, yet that must be treated as a complete gift to her of income.

2. The same construction may be argued from the gift to him of a share of the residue. Under the 8th item of the will "it is to be applied for his use and if not expended in his "lifetime," then to go over. The maxim applies of "*ex-* "*pressio unius, exclusio alterius*." The omission of a like limitation over, as to a surplus of rents, shows that none was contemplated or intended to be given over.

3. Though there was a devise over to Mary Ann of the rents, the rents previously accruing were not included. They cannot go as incident to the land, but must be as money if at all ; and therefore must pass under the will, or not at all. They cannot pass as a resulting trust to the heirs ; nor under the residuary clause, as this expressly excludes everything previously devised or bequeathed. Besides, the residuary estate was to be ascertained and distributed before any surplus of rents could accrue. The testator evidently contemplated a larger provision for Richard than the trustees in fact made. Nor did he consider him a hopeless lunatic to be barely fed and clothed, but that he might become equal to the

19—DEL. CH. IV.

responsibilities of life, that he might marry and have a family.

The doctrine of implied interest is supported by the authorities. 2 *Roper on Leg.* 1446 ; *Hammond vs. Neame*, 1 *Swanst.* 35 ; *Bird vs. Hunsdon*, 2 *Ib* 342 ; *Blackwell vs. Bull*, 1 *Keen* 176 ; *Atchison vs. Fair*, 3 *Dru & W.* 512 ; *Townley vs. Bolton*, 1 *M. & K.* 148.

Another class of cases are those where estates devised in trust for maintenance and support are held to pass to assignees in bankruptcy. *Lewin on Trust*, 138-9 ; *Snowden vs. Dales*, 6 *Sim.* 524 ; *Green vs. Spicer*, 1 *Russ. & M.* 395 ; *Graves vs. Dolphin*, 1 *Sim.* 66 ; *Piercy vs. Roberts*, 1 *Myl. & K.* 4 ; *Lear vs. Leggett*, 2 *Sim.* 479 ; *Whitefield vs. Prickett*, 2 *Keen* 609 ; *Lewis vs.Lewis*, 6 *Sim* 304 ; *Lord vs.Bunn*, 2 *Young & Coll* 98 ; 2 *Roper on Legacies* 1449.

Another principle is,that a legacy,given for the benefit of a party in a particular way,which becomes impracticable from his becoming *non compos*, may be applied in some other way to his advantage. *Stock on Non Com.* 210 ; *Barlow vs. Grant*, 1 *Vern.* 255 ; 2 *Roper on Leg.* 1496-7 ; *Neville vs. Neville*, 2 *Vern.* 430 ; *Barton vs. Cook*, 5 *Ves.* 463. An examination of the account shows that the lot was purchased out of the rents, and, being so purchased with Richard's funds, which, but for the conversion, would have gone to his administrator, the lands must take the same course of succession, and either go to his administrator or be sold and the proceeds paid to him. 1 *Wms. on Ex'rs*, 590 ; *Lord Plymouth's Case*, 2 *Freeman* 199 ; *Audley vs. Audley*, 2 *Vern.* 192 ; *Gibson vs. Scuddimore*, 1 *Dickens* 45 ; *Lord Wincheslea vs. Norcliffe*, 1 *Vern.* 435 ; *Witter vs. Witter* ; 3 *P Wms.* 99.

It will doubtless be claimed that a conversion for the benefit of an infant or a lunatic would stand ; but these cases are all on their facts, cases in which timber was cut or other acts done in the management of the estate ; not

cases of conversion. *Ex parte Bromfield*, 1 *Ves. Jr.* 453 ; *Ex parte Grimstone*, *Amb.* 706 ; *Oxenden vs. Lord Compton*, 4 *Brown* 231 ; *S. C.* 2 *Ves. Jr.* 69 ; *Ferguson vs. Leslie*, 2 *Atk.* 412.

The investment, although a safe and profitable one, was without authority and cannot stand, even if the title was taken to Richard. But the conveyance was not even taken to Richard, though purchased with his money ; but is subjected to trusts for the benefit of others than Richard. It operates as a pure gift to the Mailley children, if out of the rents. Even if it were bought out of the residuary share, it was unauthorized and taken out of the trust. Neither the administrator, next of kin nor heirs are precluded by the partition, because these proceedings are of no effect as against them, they not having been parties.

With respect to the question as to how much of the residuary fund was applied to Richard's maintenance, the accounts are not available, as they do not show which of these funds was applied to his support. It must be determined by the will and general principles. The expenses exceeded the receipts from the residue, during the period of the account in which the payments are charged. This disposes of the residuary share, if that was the primary fund.

Where an infant or lunatic has an interest in two or more funds, one more certain than another, the Court will direct maintenance out of the one least certain and indefensible, that being more for his advantage. *Hill on Trustees* 401 ; *Rawlins vs. Goldfrap* 5 *Vesey* 440 ; *Ex parte Ashley*, 1 *Russ. & M.* 371. The principle of application looks to the interest of the infant or lunatic, or, as the case now stands, of his representatives ; and not of those entitled under a limitation over. *Foljambe vs. Willoughbly*, 2 *S. & S.* 165 ; *Winch vs. Winch*, 1 *Cox* 433. If there is no principle to govern this question, then it must be

applied *pro rata.* The allowance of the accounts is not to be treated as a judicial confirmation of the transactions involved. It does not appear that any question as to what fund was applied was brought to the attention of the Court. The assumed general intent to give to Mary Ann all, not carved out, must be found on the face of the will. There must be some expression applying to the subject-matter claimed, *i. e.,* the surplus. It is not disposed of in any terms to Mary Ann. The gift over of the moiety of the lands does not imply it.

*T. F. Bayard,* for the defendants,—the trustees and the three adult Mailley children.

All the questions are to be controlled by the intention of the testator indicated by the will, and the intent is to be collected, so far as is not clearly determined by the terms, by reference to the circumstances in which he stood. The general intent is the key of interpretation, often controlling particular expressions or provisions. Observe the difference between the gifts to Richard and Mary. The latter is equivalent to a fee ; the former to an estate for life, with remainder to Mary. It was equivalent to a devise to her of the whole in fee, with what proved to be a life estate in Richard, carved out, though it might have been enlarged had he left issue. In the mind of the testator Mary Ann was to take all not left to Richard.

Another difference was that no direction or control was given to the trustees over Mary's moiety. Richard's inability to manage property or take care of himself, in his father's judgment, may be demonstrated from the will. He is placed in precisely the same condition as an adjudged lunatic. His use for property is limited to maintenance. Such we must consider to have been his father's view, and his provision as looking only to this object. As to the surplus, it was to go without expressed limitation

to Mary, to whom the whole was given, except what was carved out. In all the cases cited there was something said of the accumulations to carry them over. Here the questions must be left to implication resting upon the considerations stated.

With respect to the conversion, the governing principle is that the Court will look only to the interest of the lunatic, not of those who come after him. What then seemed to be his interest is the question. His income was at first exhausted. First came the Wilson legacy. Of this, under ordinary rules as to infants, the income only was applicable ; the capital was to be preserved. The like rule of protection applies to lunatics. *Hill on Trustees* (399) ; *Eyre vs. Shaftsbury*, 2 *White & Tud. Lead. Cases in Eq.* 245. (4th Am. Ed'n) This case presents an exception, viz : that where an infant alone is interested, as in this legacy, the Court is not strictly held, but may expend the principal, if necessary. True there must be necessity but ill health or weakness of mind or body is sufficient. Under the circumstances, the Court would have allowed the expenditure of this legacy.

Next, had they the right to use the residuary share ? Here too, in the residuary clause, Richard and Mary are coupled in interest ; she to take what should not be applied for him. The two-elevenths, *i. e.*, the capital of the fund, "shall go absolutely." True, his interest was paramount, and it might, if necessary, be expended in his·lifetime. But there was another provision for Richard, substantially in the same terms, both with respect to himself and those to take after. What interest, then, of Richard required the residuary share, which was capital, to be expended in preference to the rents ? Considering his condition, the application of the rents was more beneficial, because over them the trustees held a discretion. It was to his benefit to exhaust first that which was subject to a restriction, leaving to him what was his

without restriction ; that is, if he recovered, in which case only, was there any difference to him. But again, the rents were the natural primary fund, because, in the testator's contemplation, more certain and definite.

With respect to the purchase of the lot, the trustees cannot, without authority, permanently change a fund from personal to real, or *vice versa*. *Hill on Trustees*, 537. *Adams., Eq.* 296.

The accounts show that not a dollar of the rents could go to buy the land, being insufficient for that purpose ; while the trustees had in hand another fund which was sufficient and applicable. We must, therefore, treat the lot as bought with the residuary fund and subject to the same trust.

All the cases cited, of accumulations going to representatives, are of infants, during their minority. and where on their majority they would take the *corpus* ; or to a person, *sui juris*, for life. Richard's condition of imbecility and the discretion given to the trustees, and the necessity of preserving the fund, preclude its passing to assignees in bankruptcy. The case is not within the ordinary rule, but distinguishable from it upon the fact of lunacy. In all cases of lunacy, where maintenance only is contemplated, the accumulations are presumably for the persons entitled over.

The effect of the partition was that of a decree *inter partes*. It was conclusive as to the title vesting upon it, *i. e.*, the title of the trustees under the trust. Were it otherwise, Mary Ann was at least entitled to one-half. But this lot is so involved in the Thomas estate that it cannot be unraveled.

*G. B. Rodney*, for the defendant, Catharine E. Mailley.

The first question concerns the Tatman lot, and is the least important. We say the purchase was with the resi-

duary share ; and if that be so it disposes of the question, for it is limited to go over if not expended. Apart from the calculations based on the accounts, even though we cannot show specifically the application of the residuary share, if it appears that such a fund came to the hands of the trustees it will be presumed that they used the funds which they could rightly so apply, *i. e.,* the funds subject to the like trusts as the real estate and substantially in hand ; whereas the rents were small and insufficient for support. The trustees were also executors and had knowledge of the residue. It was not necessary for them to actually transfer money, only from their hands as executors to their hands as trustees    It is not presumable that they took the rents before Richard's wants were first met, (that being the primary fund for support,) when they had another fund. The effect of that would be to starve Richard to benefit others. This presumption can be answered only by conceding both funds subject to a limitation over.   It must be observed that at the time of the purchase they had the fund, or the command of it, at least incoming or to be contemplated.   If the land was bought in view of an incoming fund which would properly be applicable, that would control the question.

But if the lot was not bought with residuary share, it was substantially paid for by trustees' own money ; for if the rents were so in part applied then they supported him themselves, which is equivalent.

Again, the acts of the trustees, in all matters appearing by these accounts, have been judicially sanctioned by the Chancellor, under the express direction of the testator, so that they are now conclusive. The taking of the conveyance upon these trusts and the subsequent proceedings conclusively establish the presumption as to the fund applied.

Again, the title as resting on these proceedings, is not now to be disturbed.   To disturb it would be to cause

the Mailley children, as the parties entitled to Richard's share, to lose the lot, as they have no resource for contribution as against the other moiety, that being now held in great part by purchasers. As the transaction cannot be unraveled without great injustice to somebody, the remedy must be against the trustees; and the Court can do nothing in that case, as the accounts protect them.

The second question is, who are entitled to the surplus rents? Richard's interest in them was a maintenance only. The direction is "to pay, apply and dispose of" the moiety of Richard, but for his maintenance. It is not a bequest, but a provision for his support, to which only the fund was dedicated. If a gift to him it might have been claimed by him, or reached by his creditors. If he could not have claimed it his administrator cannot now. The reason of the limitation over to Mary Ann is that the testator expected Richard to exhaust the income of the other moiety during his life. Then, too, the different phraseology of the two gifts shows the intention of the testator. Where, as in this case, the trustees take not only the legal estate, but the possession, the *cestui que trust* takes no estate under the statute, but only what is strictly given. *Fletcher on Trustees* 40 ; 2 *Sto. Eq. Jur.* 974. Richard was not strictly a *cestui que trust* of the property; he had no interest in the land, but an equitable interest to maintenance out of the profits. He was entitled to nothing as accruing from an interest in the land, not to rents and profits in this way, but only so far as expressly appropriated. Then the surplus rents remain in the hands of trustees for the purposes of the trust, and go with the lands to the party in remainder. It is incident to the real estate, except so far as separated for maintenance. If treated as a resulting trust, it still goes to Mary Ann as devisee of the land. *Attorney General vs. Bristol,* 2 *Jac. & W.* 307 ; *Fearne on Remainders,* 456.

*E. G. Bradford*, for the children of Samuel C. Thomas and Edward H. Thomas.

The defendants whom I represent, with Mrs. Mailley are heirs of Richard Thomas, and we claim for them one-half of the Tatman lot, with the surplus rents and profits. I shall discuss two questions of law and one of fact ; 1, what estate Richard took in the rents ; 2, that the land is to be treated as real estate ; 3, that the land was in fact purchased with the profits.

*First*, we will consider the last question, as stated, with what funds the purchase was made. Taking the accounts for what they show, and we have no other light on the subject, we find that the purchase was made with the rents. Supposing Richard entitled to the rents and profits, on what ground can we assume that it was the residuary share used to make the payments, against the declaration of the accounts ? The first two payments were unquestionably made of the rents, and it is presumable that the last were so made.

Again, the purchase was made for the joint benefit of Mary and Richard, and therefore is not presumed to be paid for with Richard's separate funds. The trust of the lot was in moieties, as the original real estate and the accruing rents were until they were divided.

*Second.* Richard Thomas took an absolute estate in one-half of the rents, subject to the power and discretion of the trustees to expend them for his maintenance. This discretion does not limit the character or value of his estate, but pointed out duties, which, if not fulfilled, left the estate of Richard intact. That a *cestui que trust* cannot handle an estate does not argue that he takes no transmissible interest in it. To whom do the surplus rents go, if not to Richard ? They are separated from the real estate, and not limited over.

20—DEL. CH. IV.

The direction to apply &c., embraces the whole moiety, and evidently contemplated a disposal of the whole. Do they result to the heirs of the testator, undisposed of? If so, they pass to the defendants whom I represent, and the Mailley family. We contend that Richard took them, upon two grounds, from the words of disposal and from a fair construction of the will.

(1.) " The other moiety" is what is disposed of, not part, or so much as is necessary, but all. If the testator meant to apply what might be necessary, why not so provide? Then, too, it is to be observed that the terms are precisely those used respecting Mary Ann, except in adding the word " comfortable."

(2.) The general manifest intent, as drawn from the whole will, shows that the testator evidently contemplated the restoration of his son Richard, at, least his marriage and having children, requiring more than bare personal maintenance. The express limitation over of the residuary share brings the case within the principle "*expressio unius, exclusio alterius.*"

. *Third,* The Court has power to convert a minor's estate, when advantageous. 1 *Madd. Ch. Pr.* 339–340. If the land is purchased it is treated as realty, with this qualification, that if the minor die in infancy it passes as personalty. This is to save his right to dispose of it by will. In England, an infant over seventeen years of age can make a will of personalty. *Ex parte Phillips,* 19 *Ves.* 122–123 ; *Winchelsea vs. Norchiff,* 1 *Vern.* 435 ; *Inwood vs. Gwyne, Ambler* 417. The principle applies with greater force to the lunatic, because his interest is exclusively controlling, and not that of any who are to come after. In his case, the possibility of a lucid interval and power of disposal is always open ; therefore, while he lives, it is treated as personalty ; but being now dead, and all possibility of

disposal being at an end, it passes as realty. *Oxenden vs. Ld. Compton*, 2 *Ves. Jr.*, 69 ; *Lord vs. Lady Ashburtan*, 6 *Ib.*, 4-5-6 ; *In re Salisbury*, 3 *Johns. Ch.* 347.

THE CHANCELLOR :—

The object of this bill is to ascertain the rights of the parties with respect to certain trust property held by the defendants, Messrs. Corbit and Spruance, as trustees under the will of Samuel Thomas deceased ; being that portion of the testator's estate which he devised in trust for the benefit of his son Richard Thomas, now deceased, during his lifetime, with sundry remainders over upon his decease. The whole trust estate now consists of over $20,000 held in money and securities, together with a considerable body of real estate. The present controversy concerns the whole personal fund and a small part of the real estate, to wit, a lot of twenty-two acres situated in Odessa. I will consider first the questions raised with respect to the personal fund.

This fund was derived originally from three sources, viz :

(1). A small sum, amounting with interest to $147.38, was received by the trustees in July 1830, as a legacy bequeathed to Richard Thomas by the will of his grand father David Wilson.

(2). The further sum of $1405,03 was (exclusive of interest) Richard's share, two-elevenths, of the residuary estate of the testator Samuel Thomas,—which share was bequeathed to the trustees upon certain trusts in the residuary clause set forth. This sum came to their hands in several amounts, at sundry dates between July 21, 1832 and May 20, 1838, in the course of the settlement of the testator's estate.

(3.) All the balance of the trust funds was derived from a moiety of the clear rents and profits of certain real estate which was devised by the testator to the trustees

for the benefit of his daughter Mary Ann and his son Richard, under the trust declared in the will. The accumulated surplus of this moiety over and above the sums expended for Richard's maintenance constitutes the bulk of the trust fund as now held.

*First*, then, as to the legacy from Richard's grandfather.

This legacy was no part of the trust estate, that estate being created under the will of Samuel Thomas, deceased. But this small sum being in the hands of the executors of Samuel Thomas, (who in his lifetime was the grandfather's executor,) and these executors being also the trustees for Richard under Samuel Thomas' will, and having as yet received no funds from the trust estate for Richard's maintenance, they applied this legacy to that object ; and in their first account passed before the Chancellor in July, 1831, this appropriation of the legacy was allowed. Messrs. Corbit and Booth were liable under Samuel Thomas' will for this legacy as executors only, and not as trustees. They became chargeable in the latter capacity only by voluntarily charging themselves with the legacy in their trustee account, but the same account discharged them by allowing the application of the legacy to Richard's support. Assuming the allowance to be now open to question it must be considered a proper one, under all the circumstances. There is therefore no ground to charge the trustees as such with respect to this legacy ; nor, indeed, could a claim to it be maintained under Richard in any direction. Not even against Corbit as the surviving executor ; for it would be a sufficient answer that Richard had received the full benefit of it in his lifetime in the best mode that his situation admitted of. We may then treat the legacy as long since exhausted and as forming no part of the fund now held by the trustees.

*Second*, with respect to that part of the trust fund which was derived from Richard's residuary share of his

Father's estate, $1405 03, with its interest,—we are to inquire how was this disposed of ? and does it, or any part of it, still remain ? and if so, to whom does it belong ?

With this residuary share the trustees, who were also the executors of Samuel Thomas' will, charged themselves in their several trust accounts with Richard, passed before the Chancellor, between the years 1832 and 1838, as follows :—

| | |
|---|---:|
| 1832, July 21 .........................$ | 200 00 |
| 1833, May 16............................ | 200 00 |
| 1834, July 10........................... | 200 00 |
| 1835, March 3...... .................... | 200 00 |
| 1835, July 7.. .......................... | 100 00 |
| 1836, Feb. 8............................. | 305 03 |
| 1838, May 20...... ....· ................. | 200 00 |
| | 1405 03 |

The trustees also charged themselves with interest from the respective dates at which these sums were treated as received from Samuel Thomas' executors.

With respect to the disposal of Richard's residuary share it appears from the accounts that the first payment of $200 charged as having been received in July 21, 1832, was applied to meet a deficiency of Richard's moiety of the rents accrued up to that date for the expense of his maintenance, and that the balance of his residuary share, with its interest still remains in the trust fund as now held.

The accounts show the following to have been the course of the administration of the trusts. The testator died March 5, 1829. The first fund of Richard realized for his support was the small legacy of $147.38 under his grandfather's will, received April 26, 1830. The next fund received and so applicable was Richard's moiety of the clear rents profits as ascertained by the joint account of

the trustees Richard and Mary Ann passed July 13, 1831, Richard's moiety being $277.07½. No part of the residuary share had as yet been received. Meanwhile, during the interval between Samuel Thomas' death and the passing of the first account of rents and profits, something over two years, Richard was maintained by the trustees at an expense, including interest and commissions, of $1053.36. Against these expenses the Chancellor allowed the trustees, in their separate account with Richard, passed the same day, July 13, 1831, to credit him with the legacy from his grandfather and also his moiety of the clear rents and profits as shewn by the joint account of that date a the two credits amounting to $425.28½, and leaving still a balance overpaid by the trustees for Richard's maintenance to that date of $628.07½. Between the date of these first accounts and of those next passed, the second accounts May 13, 1833, nearly two years elapsed, during which, on the 21st July, 1832, the trustees received the first payment on account of Richard's residuary share amounting, with some interest, to $209.63 ; and in addition to this there accrued his moiety of the clear rents and profits of those two years, which moiety as the same was ascertained by the joint account of May 13, 1833, was $961.78. These two funds made $1171.41, applicable to the balance of $628.07½ overpaid by the trustees on the first account and to Richard's maintenance during these two years. It so turned out that these two funds, viz : the first payment from the residuary share and the moiety of the clear rents for those two years, were just sufficient to sink the balance overpaid by the trustees and to meet Richard's expenses up to the date of the second accounts, leaving a small balance of twenty-seven cents due to Richard. These appropriations were allowed by the Chancellor ; and thus the first payment from the residuary share clearly and necessarily went to make up the then deficiency of Richard's moiety of the clear rents and profits to pay his expenses. This use of Richard's residuary share is author-

ized by the terms of the will. It is clear that the testator contemplating a probable deficiency of the rents, which at that time were small intended the residuary share to be an auxiliary fund to be applied as might become necessary, for Richard's maintenance. It will be observed that the testator does not require Richard's share of the residue to be kept invested, but directs that it be "ap- "plied for his use and benefit, and if not expended or "disposed of in his lifetime," then over. The next accounts, being the third set, were passed January 27, 1836, after an interval of nearly three years. During this interval the trustees received on account of the residuary share sums, amounting, with interest, to $761.78 ; and they held additionally for Richard's maintenance through this period a moiety of the clear rents amounting, as shewn by the joint account passed at this date, to $1683.-24. Richard's personal expenses during this interval, with interest and commissions, amounted to $958.06, a sum quite within his moiety of the rents. The next set of accounts, passed January 22, 1840, shew that the trustees during the interval between the accounts of 1836 and 1840, received two more and the last payments on account of Richard's residuary share amounting, with interest, to $597.49 ; and further that during the same period Richard's moiety of the clear rents quite exceeded his expenses,—his moiety being $2571.26 1-4 ; and his expenses with interest and commissions, $2141.08. It appears, therefore that while the first payment of $200 on account of the residuary share was necessarily applied to make up a deficiency of Richard's moiety of the clear rents to meet his expenses, the subsequent payment, amounting in all, with interest to the dates of the respective accounts to $1359.27, were not so requisite ; and considering, as I do, that Richard's moiety of the clear rents and profits was the primary fund for his maintenance and his share of the residue auxillary only, I must treat that portion of his residuary share which was not requisite for

maintenance as being still intact, forming part of the gross fund now held by the trustees, and as subject to whatever rights may attach to it under the will   Under the limitation of the residuary clause touching Richard's share of it, he having died without issue, and Mary Ann Thomas without a will or appointment, so much of the present trust fund as represents the unexpended portion of Richard's residuary share (which includes all except the first payment received by the trustees) belongs to the heirs at law of Mary Ann Thomas.   The amount will be $1359.-27, with interest on the several payments composing it from the respective dates to which the trustees are charged as having received them.   This account will, however, be somewhat reduced before the final disposal of the cause ; for, as will appear in the sequel of this opinion, the residuary share, or what remains of it, is liable to reimburse to the surplus of Richard's moiety of rents and profits so much as was applied out of that surplus toward the purchase of one moiety of the twenty-two acre lot. That will be a point for distinct consideration hereafter.

It was strongly insisted on behalf of the heirs of Mrs. Mailley (the Mary Ann Thomas of the will) that one moiety of the price of the twenty-two acre lot (the whole price being $781.56) must be considered as having been paid out of Richard's residuary share ; and not, as the complainants and some of the defendants contend, out of his moiety of the rents and profits.   This point was discussed as being material in determining the rights of the respective parties in the lot.

There is no doubt upon the face of the account that *as a matter of fact* the entire price of this lot was paid out of the joint rents and profits before any division of them into moieties, one moiety for Mary Ann's separate use and the other for Richard's maintenance. Let us look closely at this point.   This twenty-two acre lot was a part of Samuel Thomas' residuary estate, devised by the

will to be sold by the executors, and the proceeds, together with the surplus personal estate, to be divided among the residuary legatees. After his death it was considered desirable for the benefit of the real estate held in trust for Mary Ann and Richard, that the twenty-two acre lot should become annexed to it and held subject to the same trusts,—the special object being to annex the lot to the mansion house in Odessa, which was part of the trust estate. In order to effectuate this object and not at all with any view to an investment of the residuary share, the executors conveyed the lot to Tatman and afterwards took to themselves a reconveyance, in which the object of the transaction as just stated, was fully recited and the lot was subjected in express terms to the same trusts under which the real estate devised for Mary Ann and Richard was held. The substance and whole effect of the transaction, was to withdraw the twenty-two acre lot from the residuary estate and annex it to the trust estate. Of course it became necessary that the residuary estate should receive an equivalent in value, which equivalent seems to have been fixed at $781.56. To effect this no money was passed, but the executors charged themselves in the testamentary accounts with this amount at three several dates, viz : July 6, 1830, May 21, 1832, and July 21, 1832, that is, with $260.52 at each of these dates, as money received from the trustees, they being themselves the trustees. Now, whether the trustees are to be considered as having made these payments out of the one fund or the other, *i. e.*, the whole out of the rents, or Richard's portion out of his residuary share which is the point of dispute, is conclusively determined by the joint accounts of the real estate passed July 13, 1831 and May 13, 1833. It will be observed that the trustees passed two sets of accounts :—one set of which are those just referred to, shewing these transactions with the trust estate as a whole,· such as the receipt of the gross rents and the payment of taxes, repairs &c., the object

21—DEL. CH. IV.

being by these accounts to ascertain the net balance for division into two moieties for the benefit of Mary Ann and Richard respectively. At the same time they passed separate accounts with Mary Ann and Richard of their respective moieties and the charges to which these were subject. Now to the joint accounts of 1831 and 1833 it will be found that the trustees are credited as against the gross rents and profits with the entire price of the twenty-two acre lot, before any division of the clear surplus. The allowance of these credits by the Chancellor made them, in fact, a payment for the lot out of the rents and profits before division. Whether this application of the gross rents was erroneous, and if so what consequences result, are questions to arise in another connection. The present inquiry is only how in point of fact Richard's residuary share has been applied, and what portion of it remains unexpended. The conclusion on this point is that no part of it was applied to the purchase of the twenty-two acre lot,—that except the first payment of $200, which was expended for Richard's maintenance the whole residuary share yet remains, though subject, as will presently be seen to reimburse to the surplus rents and profits, held for Richard and those in remainder upon his death, so much as was taken from that fund to pay for Richard's share of the price of the lot.

*Third.* We now reach the chief point of controversy, viz : who are entitled to the surplus of that moiety of the rents and profits which was devised in trust for Richard's maintenance? Did it vest in Richard so as to be transmissible to his administrator? or if not, was it, upon his death without issue, carried by the limitation over to Mary Ann and her heirs? or, if undisposed of by the trusts of the 4th item, does it pass under the residuary clause or, does it result to the testator's heirs at law as being wholly undisposed of by his will? All these questions are covered in the argument.

Opinion :—Richard Thomas took no transmissible interest.

In the first place, I am of opinion that Richard Thomas took no interest in the rents and profits transmissible to his representatives. The trust vests in him no estate nor any disposable or transmissible interest, either in the land or in the rents : but it is only a provision for his " comfor-"table and respectable maintenance and support out of its "rents, subject to the discretion of the trustees as to the manner and place of his support." Observe, first, the terms of the trust. It is not a trust to hold the rents for Richard's use,—nor even to apply and dispose of them for his general benefit :—but it is "to pay, apply and dis-"pose of the other moiety from time to time as received, to "the comfortable and respectable maintenance and sup-"port of my son Richard Thomas, during his natural life, "at such place and in such manner as my said trustee, or "the survivor, or his assignee, in their or his discretion "may think proper." Certainly these words *ex vi termini* impart no estate or interest in Richard, with respect to either land or money. Such must be their construction even if read without any view to the circumstances under which the provision was made ; but when read in the light of the fact, admitted in the agreement filed, that Richard was of imbecile mind and wholly incompetent for the care of property, they clearly disclose the testator's purpose to exclude all possible control by Richard over the fund, either directly or consequently,—such control as a vested interest would carry. It need hardly be stated that, in the construction of wills, it is the admitted rule to read a provision in the light of all facts and circumstances surrounding the testator and bearing upon the subject matter. 2 *Phillips on. Ev.* 293, at large and cases cited. It would be very hard, though, of course, not impossible to raise against the direct effect of this, the operative provision of the will on this point, a gift of the rents to Richard from the collateral provisions of the trust. The effort to do so has been made with much ingenuity. But after a careful consideration the argument from implication seems

rather to support than to weaken the effect of the direct terms of the trust as a provision for maintenance only, exclusive of any disposal or transmissible interest in the fund. Let us see. In the first place, the bare fact now admitted and which is plainly recognized in the frame of this provision, that Richard was imbecile and totally unfit to manage his affairs affords the most powerful implication the case admits of against the gift of any disposable interest in the fund, for the vesting of such an interest would subject to Richard's debts and engagement the very fund which the testator was so sedulously endeavoring to guard for his support. It must be borne in mind that any interest in the fund transmissible to representatives must be also assignable, devisable and subject to debts. To the same general effect, viz : the exclusion of Richard from all possible control, not only over the management but also over the distribution of the estate after his death, is the withholding by the testator of any power of appointment by Richard of the estate among his issue, should he leave any,—a power quite usual under trusts created to guard the *corpus* or capital for children but leaving to the parents an interest for life in its income or profits. Some stress was laid upon the fact that the testator, in providing for the contingency of Richard's marriage and having issue, contemplated his possession or, as was argued, probable improvement in mental capacity. Limitations of this nature, looking to the possibility of issue of one taking a benefit for life under a trust, are so much a matter of course in wills and are so generally introduced at the mere instance of the draftsman, as hardly to warrant the inference of any such definite expectations on the part of the testator as to have induced him to give Richard an estate such as he could control or dispose of, and that too without the condition of such restoration ever in fact taking place. Certainly it is a ground altogether too slender to support a construction to that effect of the provision made for

Richard, going, as it does, so far beyond its plain import. Then, again, with respect to that clause in the bequest of two-elevenths of the residue to the trustees of Richard which expressly limits it over, on his death without issue, to his sister, this clause really seems, though the very contrary was argued, to support that construction respecting the trust of the rents which gives to Richard a maintenance by means of them and not a transmissible estate in them. For, so much care evinced in this limitation of Richard's residuary share to secure so small a sum as it proved to be, against his control or the consequences of his acts, would not be reconcilable with the purpose to leave a surplus of the profits of the real estate unprotected, could the testator be supposed to have contemplated that any such surplus would accrue. The obvious explanation of the fact that there is a limitation over of the residuary share, upon Richard's dying without issue, and none of the rents, is found in the expectation of the testator that Richard's maintenance would absorb a moiety of the clear rents and profits, but might not require all of the auxiliary fund provided for his support out of the residue. That such was his expectation is clearly apparent from his providing a fund auxiliary to the rents and it was well warranted by what the accounts shew to have been the productiveness of the property in the testator's lifetime,—its great improvement since his death having resulted from the subsequent management of the acting trustee Mr. Corbit. Indeed, this expectation of the testator that the rents appropriated for Richard's maintenance would be exhausted, satisfactorily explains several grounds mainly relied on for implying a transmissible interest in Richard in a moiety of the rents. It accounts for the appropriation in terms *of the whole moiety* to Richard's maintenance,— also for the omission, in the limitation over to the sister, of any gift of a surplus of the rents, or for the omission of any other disposal of such surplus; while it answers, as we have seen the argument drawn from the maxim *expres-*

*sio unius*, *exclusio alterius* as applied to there being an express limitation over of the residuary share on Richard's death without issue, while there is no like limitation over of any surplus of rents :—a maxim, by the way, which raises but a very inconclusive presumption of intent on the part of a testator such as is always open to be explained by collateral circumstances or to be rebutted by counter presumptions arising upon the will.

Let us now turn to the authorities cited upon provisions of this nature. It is to be regretted that none are found in which the question was raised, as here, on behalf of the legal representatives of a deceased party who was in his lifetime the object of the trust. In all the cases cited the claim was between the trustees of the beneficiary while living, and his assignees in bankruptcy under the English law. They involve the same question here presented, viz ; whether the beneficiary under such trusts takes a transmissible interest in the fund, but with this very observable difference, that in cases under the bankrupt laws the policy of preventing frauds upon the law by the continuance of trusts which give to a party the substantial benefits of the ownership of property, without its being subject to his debts, has led the courts in those cases to carry the presumption, in favor of an interest transmissible to the assignees in bankruptcy, beyond what might be deemed necessary or even warrantable in cases between parties claiming the fund after the death of a person who was the subject of the trust, in which cases no public policy is involved. Yet even the cases under the bankrupt laws proceed upon a principle which will be found not to sustain the claim of Richard's administrator. The principle of those cases is this : that a trust for the general benefit of a person who is *sui juris*, a trust which is not in terms limited to the purpose of mere maintenance, and which, therefore, *may* be so used as to afford the substantial advantage of ownership and at the

same time be a cover against liability for debts, shall be held to vest an interest assignable under the bankrupt law. The express exclusion of creditors found in some of this class of cases only renders them more directly obnoxious to the policy of the law : nor does the latitude of discretion sometimes given to trustees, to withhold the fund, save such a case; for the material question, under the statute, is not whether the trustees *may* use the fund only for maintenance, but whether they are at liberty to go beyond maintenance. If the latter, then as the trust *may* be used as a cover against creditors it is within the policy which treat these trusts as vesting an interest assignable in bankruptcy. The only mode of saving from the effect of bankruptcy a trust for the general benefit of the party, is by limiting it to continue only until bankruptcy or insolvency and to determine absolutely in such an event. *Lewin on Trusts, Ch. VI. Sec. 2*, at large.

A brief notice of the cases relied on will be sufficient to shew the principle stated. In *Snowden vs. Dales*, 6 *Sim.* 524 (9 *Eng. Ch. Repts.*) the party was *sui juris*, the trustees were authorized in their discretion to pay the interest to him, though they were also authorized to withold it and apply it only to procuring diet and other necessaries, and the trust was framed for the avowed purpose that no creditor of his should have any claim thereon nor should the same be subject to his debts, disposition or engagements. In *Piery vs. Roberts*, 1 *Myl. & K.* 4, (6 *Eng. Chy. Repts.*) the party was *sui juris* and the fund *made payable to him, both principal and interest*, the trustees having a discretion only as to the times of payment and amount,—with a limitation over on his death as to any sums then remaining unpaid. Upon his bankruptcy he was held to be substantially entitled to the whole legacy, which therefore passed to his assignees. In *Groves vs. Dolphin*, 1 *Sim.* 66, (2 *Eng. Chy. Repts.*) the party was *sui juris*, and an annuity given to be paid into his proper

hands, for his personal maintenance and support, but not to be liable for his debts. The case chiefly relied upon was *Green vs. Spicer*, 1 *Russ. & Myl.* 395 (5 *Eng. Chy. Repts.*) That was a trust for a son who was *sui juris*, the rents and profits to be received and applied, not for maintenance and support only, but *generally, for the " benefit"* of the son, the trustees having a discretion as to the time and manner of application, and there being a restriction against the son's selling, mortgaging or anticipating the rents. It was held to carry a vested interest to the son, upon the extensiveness of the words, the fund being for his " benefit" generally, and not restricted to maintenance.

The result of these decisions is that a trust for the *general benefi*t of a person *sui iuris* which, not being restricted to maintenance only, may be so used as to confer the substantial advantages of ownership, shall be deemed to vest a transmissible interest so as to protect the policy of the bankrupt laws. But that policy has not been extended by any decision, even under the bankrupt laws, to a provission restricted to the maintenance and support of an imbecile person, incapable of managing his affairs to such an extent as to contract liabilities which ought to be protected. On the contrary in a case of that nature decided subsequently to all those before cited, *Twopenny vs. Peyton*, 10 *Simon* 487, (16 *Eng. Chy. Repts.*) it was held that no transmissible interest vested, such as would pass to assignees in bankruptcy. There the testatrix, having by will bequeathed the residue of her estate to a nephew for life, and the nephew becoming bankrupt and insane, afterwards by codicil revoked the estate for life and directed the trustees to apply during his life "the whole or such " part of the interest, at such times, in such proportions "and in such manner, for the maintenance and support of " her nephew, and for no other purpose whatsoever, as "they in their discretion should think most expedient." It was held that this trust vested no interest passing to

the legatee's assignees in bankruptcy ; and the controlling feature of the case (though some others were alluded to) as put by the V. C. Sir L. Shadwell, was that "it "would be impossible for the executors to apply the in-"come of the trust fund *for the benefit of the nephew* "*generally*, or for any purpose beneficial to him which is "not comprehended under the terms maintenance and "support." Now, it is to this precise object, viz : the maintenance and support of an imbecile legatee that the fund, in the present case, is restricted ;—I say *restricted* because, although not so in express terms, as in *Two-penny vs. Peyton*, it is by clear implication true, that the whole fund is here in terms appropriated to maintenance but it is equally true that no part is appropriated or could be applied to any other object, not even to Richard's benefit in any other mode. Nor, do our trustees have really any the less discretion than in the case last cited as to the amount to be applied to maintenance, whether part or the whole, for the direction that Richard should be maintained comfortably and respectably "in such "manner" as the trustees might think proper carries the unquestionable discretion to judge as to the amount necessary to be applied and is quite equivalent to a discretion to apply the whole or such part as in their judgment might be required.

It seems clear then that even under the policy of the bankrupt laws a trust like the present one, for the maintenance and support only of an imbecile person, would not be held to vest a transmissible interest. *A fortiori* such a trust should not be so construed as between the representatives of the deceased legatee and parties claiming under the limitation of the will, as between whom the question is one of simple intention on the part of the testator unincumbered by any considerations of policy. As a question of intent on the part of Samuel Thomas, the testator, I cannot entertain a doubt, upon the consideration

before fully stated, that Richard Thomas was to take no interest under the trust beyond his "comfortable and re-"spectable maintenance and support during his lifetime," leaving at his death nothing to pass to his representatives,

We now take up the next question touching the des-tination of the surplus rents,—which is, whether at Rich-ard's death without issue this surplus followed the limita-tions over to Mary Ann of that moiety of the real estate from which it accrued, or whether it has resulted to the heirs at law of the testator. We may lay out of consideration any claim which could be made to the surplus by the resid-uary devisees, because the residuary clause is so framed as to exclude any interest accruing from the previously devised real estate. This clause begins by directing the executors to convert into money all the testator's "real and "personal estate not hereinbefore devised or bequeathed," and then directs the distribution among his children in certain shares, of the residue (to remain after certain de-ductions) of the proceeds of such sales, together with what moneys should arise from " the collection of debts or "otherwise." It is very evident that this clause was intended to comprehend only the proceeds of undevised lands and chattels and such assets as should come to the hands of the executors as such, and not such sums as might accrue from the real estate devised in trust, coming to the hands not of the executors but of the devisees in trust. Clearly then the right to the surplus rents·must lie between the devisees over of the moiety of the estate held for Richard's maintenance during his lifetime and the testa-tor's heirs at law. Which of these parties is entitled ? The rule of law which controls the question is a clear one :—the difficulty lies in its application. The rule is this ; that all interests in land or springing out of or ac-cruing from land, which are not disposed of by the will result to the heir at law. A devise of the fee to trustees does not prevent this effect for in that case the heir takes

by way of resulting trust.   The rule is wholly independent of the testator's intent in this particular.   As it is expressed by Lord Chancellor Talbot, in a case to be presently noticed, " the law throws it upon the heir ; and " whenever the testator has not disposed, be his intent that " the heir should take or not take, yet still he shall take ; " for somebody must take ; and none being appointed by " the testator the law throws it npon the heir." *Cas. temp. Talbot,* 52. The decisive question then is, has this surplus been so disposed of by the will as upon Richard's death without issue to pass under the limitation to Mary Ann Thomas and her children ? for unless it be taken under that limitation is is not disposed of at all.

Mr. Rodney's view of this point was, that as a general rule of law rents and profits of real estate accumulated under a trust and not otherwise disposed of pass with the land to the party taking in remainder, or taking under any sort of future limitation of the land.   But this position seems not sustained by authority, on the contrary the right of the heir at law to undisposed of interests in real estate has been held to include rents and profits accumulated during a period prior to the taking effect in possession of future limitations, to the exclusion of the person ultimately taking the land.   So it was ruled in the case just referred to before Lord Chancellor Talbot, *Hopkins vs. Hopkins, Cas. Temp. Talbot* 44, a case treated as a great authority.   There it was held that rents accrued prior to the taking effect of an executory devise and not otherwise disposed of by the testator should descend to the heir.   So in *Bulloch vs. Stone,* 2 *Ves. Sr.* 521, there was an executory devise to the son of A. first to be begotten at twenty-one years of age, with a direction for his maintenance out of the rents during minority.   At the testator's death there was no son born of A. and no provision in the will for the intermediate rents and profits between the testator's death and the birth of such a son.

Lord Hardwicke held that these rents and profits went to
the heir.   He says, "where there is an executory devise,
" whether of the legal estate or a trust estate in this Court
" the rents and profits go to the heir at law ; because the
" legal estate in one case, or trust in the other, descends
"in the meantime to the heir at law."   To these cases
may well be added the great authority of Mr. Fearne,
who cited them to the rule as just stated *Fearne, Cont.
Rem.* (434).   So also *Jarman*, i *Vol.* 594, lays down the
rule.   The same rule is also recognized as a settled one
by Lord Brougham in a modern case, *Genery vs. Fitzgerald*,
i *Jacob* 468, (4 *Eng. Ch. R.*) where he held that an execu-
tory devise of a *residue*, blending real and personal estate,
would carry intermediate profits, treating this as an excep-
tion to the rule, which he thus states ; " where personal
"estate is given to A. at twenty-one, that will carry the
"intermediate interest.  If a testator gives his estate Black-
" acre *at a future period*, that will not carry the intermediate
"rents and profits.  But where he mixes up real and per-
"sonal estate in the same clause the question must be
"whether he does not shew an intention that the
" same rule shall operate on both."   It need hardly be
said that there can be no difference in principle whether
the future limitation of the land from which the interme-
diate rents and profits accrue be an executory devise, as
in the cases cited, or a remainder, as in the present case.
The rule is otherwise with respect to income accruing
from personal estate prior to a limitation over, which does
follow the fund as an accretion to it.  Mr. Fearne expressly
distinguishes between real and personal estate in this
respect, and the case of *Atkinson vs. Turner*, cited by Mr.
Rodney from Fearne, was a case of personal estate.   To
the rule which carries undisposed of intermediate profits
of real estate to the heir there seems to have been only one
exception ; and that is where the land is given over to
charitable uses, in which case the right of the heir is
subordinated to the favor shewn to charities.   But this

exception which obtained in early times, has been since disapproved of by the greatest equity judges. Both Lord Hardwicke in *A. G. vs. Johnson, Ambler* 190 and Lord Eldon in *A. G. vs. Bristol,* 2 *Jac. and Walk.* 307, the case cited by Mr. Rodney, said that at the early period when this rule as to charities was adopted in *Thelford's case,* 8 *Co.* 150, "the doctrine of resulting trusts was not under- "stood or the right of the heir at law would never in all "probability have been got over." Upon all these authorities we must conclude that the surplus rents in this case are not carried, under any general rule, with the land to those taking under the limitation over on Richard's death, but the surplus rents must be taken by the devisees over, if at all, under the testator's gift of them, express or implied.

We, then, take up the question whether there is any bequest over of the surplus rents. It was not contended that there is any gift over by direct words of the surplus rents remaining upon Richard's death, to his issue, should there be such, or to his sister or her children, in the event, which has happened, of Richard's leaving no issue. To Richard's issue, should there be such, the limitation over is of a moiety of the land only ; to Mary Ann, in the event of Richard's death leaving no issue, the gift over is of the moiety of the clear rents and profits during her lifetime, and at her death a moiety of the land is devised to her children. The devise to her for life of what is termed, "the last said moiety of the said clear rents and " profits as the same shall from time to time be received," manifestly applies only to that moiety of the clear rents to accrue *after Richard's death,* having no reference to any surplus accumulated in his lifetime. Then we are thrown back upon the single question, whether there is upon the face of this will a sufficient ground for raising a gift over of the surplus *by implication ?*

The doctrine of testamentary gifts by implication

without direct words, is certainly well established. It is a necessary concession to the circumstances under which wills are for the most part made, being by testator generally *inops consilii* and often *in extremis*. But this doctrine is subject to some limitations, quite well defined and rigorously applied, such as are necessary in order to guard against its tendency to introduce a distressing uncertainty into the construction of wills. In the first place, the evidence of the testator's intent to be accepted in lieu of express words must arise from the face of the will and not from facts or circumstances, or even from direct proof of interest, *dehors* the will. Further, the implication from the will must be of a conclusive nature, such, according to Lord Eldon's test of certainty, that " an intention to the contrary cannot be supposed." *Wilkenson vs. Adamson*, 1 *V. & B.* 466 ; 2 *Jarman on Wills* 745, 5*th Rule of Construction*. Again, and it is this requisite which concerns the present case, a gift by implication pre-supposes that the testator had the subject-matter of the gift before his mind and intended the disposal of it in question, but through inadvertence or unskillfulness has failed to make the devise or bequest in direct terms. All conjecture is excluded as to what the testator *would have done in an event not actually contemplated had it been brought to his attention.* On this point there are some forcible observations by Lord Mansfield in what, perhaps, is the fullest exposition of the subject yet given. *Jones vs. Morgan*, 7 *Bro. P. C.* 130 ; *Fearne on Cont. Rem. App.* 584. After denying that necessary implication should be held to mean a natural necessity, he thus defines it :   "A necessary implication is that implica-" tion arising from the words the testator has made use of " which clearly satisfies the Court what was his meaning. " It is put in opposition to conjecture." "Conjecture," he adds, " is when you suppose what would have been the " testator's meaning *if he had had the whole case before him*, " and what *if he had thought of such an event he would have*

"*said upon it.* That is conjecture." Again he says,—
"necessary implication therefore, is that which leaves
"no room to doubt.  It is not an implication upon con-
"jecture ; you are not to conjecture what he would have
"done in an event he never thought of, &c."

Lord Mansfield's distinction,—and it is one which
cannot be questioned, is decisive of our case.  For it is
apparent upon this will that the accumulation in Rich-
ard's lifetime of any surplus of the moiety of rents and
profits appropriated to his maintenance was a contingency
wholly unthought of by the testator and for which no pro-
vision was attempted or intended to be made. It is clearly
a *casus omissus.*  We cannot say of this surplus, here is
something which the testator appears from the face
of the will to have in contemplation and to have intended
to limit over, but through inadvertence, ignorance or un-
skillfulness has failed in a direct expression of his purpose.
We can at least only infer from the frame of the will as
it is what disposal he would have made of such surplus
*had the contingency of its accumulation been before his mind.*
There is certainly ground for a very strong inference that
had it been suggested to the testator that possibly Rich-
ard's maintenance might not absorb the whole moiety of
the rents he would have limited over the surplus as he did
the unexpended portion of Richard's residuary share.
For, as it was argued with much force by Mr. Bayard,
the testator having provided otherwise for all his other
children and having given over to his daughter Mary
Ann and her children, in the event of Richard's leaving
no issue, all of what he did contemplate would remain
upon Richard's death of this entire trust estate, the infer-
ence is almost irresistible that he would have contin-
ued in the same course of succession any surplus rents
which might accrue from the trust estate had he con-
templated such a contingency, and that this should be
construed as a devise in trust of the entire trust estate to

Mary Ann and her family subject to a provision for Richard's maintenance. I have viewed the case in this aspect (the strongest it will bear for the Mailley family) often and anxiously, with an inclination not to separate the surplus from the limitation over. But after all, the argument cannot carry us beyond a conjecture, a very reasonable and strong one, but still only a conjecture, as to what the the testator *would have done with the surplus had he considered and provided for the contingency of its accruing.* It is precisely that sort of conjecture which Lord Mansfield so emphatically distinguishes from what is termed a "necessary implication."

The conclusion is that there is no disposal by the will of the surplus rents and profits and consequently, that they result to the heirs at law of the testator.

*Fourth.* The last question raised in the cause may be disposed of briefly. It arises out of the claim that one-half of the twenty-two acre lot having been paid for out of that moiety of surplus rents and profits which was appropriated for Richard Thomas' support should at his death take the same destination with the surplus of that moiety into which the purchase money would have fallen but for the purchase of the lot. This claim was made on behalf of Richard's representatives, both personal and real, by Mr. Higgins for the administrator, treating this moiety of the land as personalty, and by Mr. Bradford for the heirs at law of Richard, treating it as realty. The claim is, however, to be now considered as on behalf of the heirs at law of Samuel Thomas, the testator, to whom the surplus rents are considered as having resulted.

The claim, is in effect, that the trusts upon which the land was settled by the deed, so far as concerns the moiety limited to Richard's benefit and in remainder upon his death, shall be displaced, and the lot as to that moiety converted to the use of those entitled to the surplus of

the rents out of which the lot was paid for. It is insisted that there is a resulting trust of that moiety of the lot to the parties interested in the fund out of which the purchase money was paid, viz ; that moiety of the rents held in trust for Richard's maintenance.

It is true, as we have seen, that the lot *was* paid for out of the gross rents and profits of the real estate before any division of them for the trusts of the will, the effect of which was to take one-half the purchase money out of the moiety of rents appropriated for Richard's maintenance and so to reduce *pro tanto* the surplus of that moiety of the rents. Nevertheless, those now entitled to the surplus have not, on that account, a sufficient equity to follow the lot ; and this for two reasons.

(1.) Even supposing that there was originally such a resulting trust, it was one of those latent equities which cannot now be set up against the interests in the lot which have since intervened under the partition in chancery. Under the partition and the deed upon which the decree for partition was based, the descendants of Mary Ann Thomas hold this lot as part of the allotment made to the trustees in trust for Richard's benefit and for those in remainder. If this moiety of the lot be now taken from them they have no remedy for contribution. The result would be to unsettle a partition made under a decree of the Court of Chancery,—it being the decree of a competent jurisdiction and well founded upon the title as it then stood on the face of the deed. Now, a resulting trust in lands arising out of payment of the purchase money is an equity which like all latent equities set up against a title by deed cannot follow the land to the prejudice of rights acquired in good faith under the title arising from the face of the deed. This is a doctrine very well understood. Hence it is that a *bona fide* purchaser, for a valuable consideration, of the legal title, is protected against all latent equities of which he had not notice. Such a purchaser,

23—DEL. CH. IV.

having himself an equal equity, is permitted to retain his legal advantage, The interests acquired *bona fide* under a decree for partition, based upon the title as it then stands on the face of the title papers, should certainly receive the like protection with an ordinary purchase for value without notice. In fact, a party taking under such a partition is a purchaser for value of the allotment made to him ; since in consideration of a title in severalty to his allotment he parts with his undivided interest in the allotments made to his co-tenants. In addition to this consideration there is another of hardly less force. A sound public policy requires that partitions made under decrees in Chancery and well based upon the legal title as it then stands, shall be effectual,. and shall protect all interests acquired under such decrees,—*i. e.*, observe, as against prior latent equities,—not of course, against any outstanding title by deed in third persons who were not parties to the proceeding.

(2.) The other objection to the claim to follow the lot is, that looking to the original transaction the true equity of the parties entitled to the surplus rents, is not to have the trusts of the lot unsettled and the lot, as to a moiety, converted to uses other than those for which it was purchased, but rather their equity is, to have the fund they are interested in, viz :—the surplus rents, reimbursed the amount paid out of it for that share of the lot which was settled upon Richard and the remainder-men. The doctrine of a resulting trust in land, to him who having in fact paid for it has not taken the legal title, and the right of such a party to follow the land instead of having the money refunded, proceeds, upon the ground either of contract or fraud. The present is a case of neither ; but simply of a mistake in the application of one of two trust funds held by the same trustees to a purchase made for the benefit of one branch of the trust estate, the whole transaction having been in good faith and sanctioned by the Court

having cognizance of it. It seems that the purchase money for that moiety of the lot which was settled upon Richard and the remainder-men was not taken out of the residuary share, which was the fund held to precisely the same uses as was the purchased moiety of the lot, and which therefore was the fund to be properly applied to the purchase ; but through mistake the purchase money of that moiety of the lot was taken out of the rents appropriated for Richard's maintenance, which, as is now adjudged, did not stand under the will to the same uses as the purchased moiety. Now, had this moiety of the purchase money been taken out of the residuary share, it is admitted, that all would have been right, and no claim could have arisen to the lot contrary to the trusts of the deed. Then, most clearly all the equities of the case will be satisfied by now restoring to the fund which represents the surplus rents the amount improperly applied out of the rents toward this purchase, that amount to be now taken out of the unexpended balance of the residuary share. Then the case will stand precisely as if the proper fund had been originally applied to the purchase, exact justice will be done to the parties entitled to the surplus, and at the same time the interests in the lot which have intervened under the partition in Chancery will remain undisturbed. The enhancement in the value of the lot since these transactions does not at all enter into this question. The equities of the parties are to be considered as they arose out of the original transaction except only so far as other rights may have since intervened. They cannot be altered by subsequent contingent changes or fluctuations of value in the property, either by its advancing or depreciating. This must be self evident.

NOTE. At the next term this case received further consideration upon other questions raised and argued, and which are reported, *post*.